UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN CARTER | ) | CASE NO. 5:11CV1136 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Susan Carter Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI) . The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in her March 24, 2010 decision in finding that Plaintiff was not disabled because she could perform a significant number of other jobs despite certain limitations (Tr. 9-16). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

**I.  PROCEDURAL HISTORY**

Plaintiff, Susan Carter, filed her application for DIB and SSI on October 5, 2007, alleging she became disabled on April 5, 2006, but later amended her onset date to October 30, 2008 (Tr. 72, 127-132). Plaintiff's application was denied initially and on reconsideration (Tr. 86-88, 91-97). Plaintiff requested a hearing before an ALJ, and on February 5, 2010, a hearing was held where Plaintiff

1

appeared with counsel and testified before an ALJ (Tr. 28-58).  Bruce Holderead, a vocational expert, also testified (Tr. 37).

On March 26, 2010, the ALJ issued her decision, finding Plaintiff not to be disabled (Tr. 9-16). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 8-23).  Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 42 U.S.C. Section 1383(c).

## II.     STATEMENT OF FACTS

Plaintiff was born on June 17, 1972, which made her a younger individual at the time of her alleged onset date.  Plaintiff has more than a high school education and past work experience as a cook and hairdresser (Tr. 150, 155).

## III.    SUMMARY OF MEDICAL EVIDENCE

Plaintiff presented for an Initial Psychiatric Evaluation at Coleman Behavioral Health on May 29, 2007 for racing thoughts, trouble being around others, disrupted sleep, and nightmares (Tr. 429). The diagnosis was Major Depressive Disorder, recurrent and moderate; Post Traumatic Stress Disorder, with a GAF score of 65 (Tr. 430).

On June 23, 2007, Plaintiff was treated in the emergency room with chest pain and a knee injury (Tr. 313). Plaintiff was wheezing even after her first aerosol treatment (Tr. 313).  Her chest pain was described as clearly pleuritic (Id.).  The diagnosis was asthmatic bronchitis, knee pain, and tobacco abuse (id.)  A knee immobilizer and crutches were prescribed, as well as pain medication, including Vicodin and Motrin (Tr. 315).  An MRI of the left knee performed on July 8, 2007 showed

a medial meniscal cyst (Tr. 333).

On October 22, 2007, Plaintiff was examined by Dr. Eric Bachrach, one of Plaintiff's primary care physicians (Tr. 381). Plaintiff presented for a refill on her diabetes medication, as well as left knee pain. Plaintiff wanted an arthroscopy, but due to insurance and financial limitations, had not had that performed (Id.). On March 3, 2008, Plaintiff was treated again by her primary care physician for her history of diabetes type 2, depression, anxiety, chronic left knee pain, among other issues (Tr. 378). The diagnoses made at this visit were diabetes mellitus type 2, morbid obesity, and knee pain (Id.).

On March 14, 2008, Plaintiff resumed treatment for mental health counseling and was examined by Kathleen O'Reilly, CNP. Plaintiff had symptoms, including irritability, depression, social anxiety, anxiety attacks, and sleep disturbances (Tr. 432). Her medications relating to her mental conditions included Abilify, Paxil, and Vistaril (Tr. 432). On examination, Plaintiff was anxious and restless (Tr. 432). Plaintiff reported her anxiety is increased when in social situations (Id.). No somatic complaints were found. The diagnosis made was Major Depressive Disorder, recurrent, as well as psychotic features (Id.). On April 4, 2008, Plaintiff was treated by Dr. Lynn Klimo for a follow-up appointment (Tr. 434). Plaintiff complained of feeling anxious, irritable, depressed, and worse while on the Wellbutrin medication (Tr. 434). Plaintiff described nightmares and trouble sleeping (Id.). Dr. Klimo reported that Plaintiff had been using the crisis hotline to get through the night (Tr. 434). Dr. Klimo further noted that after reviewing an appointment card, it appeared as though Plaintiff had not in fact missed an appointment, as originally suspected (Tr. 434). Dr. Klimo opined that because Plaintiff has avoidance, hyper vigilance, control issues, nightmares, and poor sleep, she suffers from Post Traumatic Stress Disorder, in addition to Major Depressive Disorder (Id.) Cymbalta was started to treat the anxiety and depression (Tr. 435).

3

Plaintiff was examined on May 29, 2008 by nurse O'Reilly, who reported increased irritability, reported by others (Tr. 438). The goal after this visit was to increase functioning (Tr. 439). On July 1, 2008, nurse O'Reilly examined Plaintiff and continued her medications (Tr. 441).

On August 28, 2008, Plaintiff was examined by Louise Kolarik, M.D. for her history of chronic back and knee pain (Tr. 549). Plaintiff presented with complaints of hand and feet swelling over the past several days, stiffness throughout her body, and tingling and numbness in her hands, especially at night (Tr. 549). The assessment was generalized joint pain, for which tests to check for a rheumatoid factor were ordered (Id.).

On September 30, 2008, progress notes from Coleman Professional show that Plaintiff had problems with irritability, being around others, and no relief from medication (Tr. 442). Plaintiff's weight continued to increase (Id.). Prozac was added to treat Plaintiff's depression (Tr. 443). On November 3, 2008, Plaintiff reported social anxiety to the point where she felt like she was going to pass out (Tr. 436). It was difficult for Plaintiff to be in public (Tr. 436). Plaintiff's Prozac, Buspar, and Toradol were all increased (Tr. 436). On March 2, 2009, nurse O'Reilly noted that although Plaintiff has missed an appointment, it was because of transportation issues, and efforts to reach the case manager about arranging for a ride and/or cancellation went unanswered (Tr. 444).

On October 18, 2008, Plaintiff had an Adult Diagnostic Assessment performed by Crisis Intervention and Recovery, after being referred by the Mental Health Track of the Court of Common Pleas. Symptoms reported were fearfulness, panic, restlessness, fear of leaving her home, worthlessness, weakness, no interest among others (Tr. 494). The impression was Mood Disorder, Cannabis use, and bipolar disorder (Tr. 503). Plaintiff cancelled an appointment the next month due to her carpal tunnel syndrome (Tr. 506).

On January 9, 2009, Brady Steineck, M.D., one of Plaintiff's primary care physicians, examined Plaintiff, who was "well known" to him (Tr. 564). Plaintiff had several complaints, including chest pain which radiates into her left arm, right flank pain, and chronic left knee pain, among other problems (Tr. 564). Additionally, Plaintiff was very concerned with her weight, as her weight had increased to 329 pounds (Tr. 564). Plaintiff returned to see Dr. Steineck on January 28, 2009, after having been in a car accident two weeks prior (Tr. 567). Dr. Steineck reported that Plaintiff was having a knee operation the next day due to arthritis (Id.). He opined that Plaintiff had a back and cervical strain (Tr. Id.). Dr. Steineck examined Plaintiff again on February 9, 2009, primarily for problems with being morbidly obese (Tr. 569). Plaintiff also discussed her recent knee arthroscopy with Dr. Steineck (Id.).

On September 10, 2009, Plaintiff was referred for complications regarding her recurrent left chest pain and associated dizziness (Tr. 446). She had pain on her left side, which radiated into her left arm (Tr. 446). The impression was recurrent chest pain radiating to her left arm; increased LD; DM Type 2; and obesity (Id.). A cardiac catherization was performed, which showed mild to moderate left main disease, regional wall abnormality; ejection fraction 50%; left ventricular diastolic dysfunction, and borderline system ventrical hypertension (Tr. 450). An Echocardiographic Report dated September 29, 2009 showed left ventricular hypertrophy; mild left atrial enlargement; and mitral regurgitation (Tr. 452).

On October 15, 2009, Dr. Brian Simmons examined Plaintiff in follow-up and reported Plaintiff continued to have constant chest pain, as well as intermittent dyspnea (Tr. 453). The impression was coronary artery disease, and Dr. Simmons ordered a Holter monitor to further assess Plaintiff's tachycardia and palpitations (Tr. 454). The results of the Holter monitor revealed normal

5

sinus rhythm and that Plaintiff was asymptomatic (Tr. 456). On November 5, 2009, Plaintiff was examined again by Dr. Simmons for continued and constant chest pain (Tr. 457). The impression was coronary artery disease, diabetes, hypertension, fatigue, osteoarthritis, and elevated rheumatoid factor and inflammatory markers (Tr. 458). Simvastatin, Darvocet, and a Lidoderm patch were prescribed (Tr. 459).

Samel Kamel, M.D. examined Plaintiff on November 9, 2009 for her history of diabetes, obesity, and her increased dyspeptic symptoms (Tr. 460). The assessment was persistent nausea and vomiting, with epigastric pain, and bowel irregularity (Tr. 461). Gastroparesis was considered a possible diagnosis (Tr. 461). Dr. Kamel ordered a colonoscopy, which revealed rectal bleeding likely secondary to internal hemorrhoids (Tr. 462-463).

On January 20, 2010, Plaintiff was treated in the emergency room for anal pain and rectal bleeding (Tr. 598). She was noted to be morbidly obese with a long history of pain with bowel movements and blood in her stool (Id.). The history was consistent with a fissure and had a laparoscopic surgery performed (Tr. 600). The next day, she presented again to the emergency room for abdominal pain after a fall (Id.). The impression was post-operative abdominal pain, but the emergency room doctor questioned possible malingering because Plaintiff requested medication; however, malingering was not diagnosed (Tr. 600). On January 27, 2010, Plaintiff again presented to the emergency room – this time with left arm pain, after being in the emergency room numerous times the week before with left arm IV's each time (Tr. 611). The concern was that Plaintiff had a deep vein thrombosis, and further testing was ordered (Id.). The diagnostic impression was left arm superficial venous thrombosis (Tr. 612).

A Psychiatric Review Technique was completed by David Dietz, Ph.D., a state reviewing physician, who opined that Listings 12.04 and 12.06 should be considered, but he found no severe

impairment (Tr. 356-366). However, Dr. Dietz found mild limitation in social functioning and maintaining concentration and pace, but no limitation in daily living and no episodes of decompensation (Tr. 366).

State reviewing physician, Dr. J. Cole, limits Plaintiff to medium work, but that she can never be on ladders due to Plaintiff's weight, which exceeded 300 pounds (Tr. 286).

A Mental Impairment Questionnaire was completed by Kathleen O'Reilly, a certified nurse practitioner at Coleman Behavioral Health. Nurse O'Reilly diagnosed Major Depressive Disorder and Personality Disorder (Tr. 487). Some rule-out conditions were also noted, including malingering (Id.). Symptoms advanced were pathological dependence, deeply-ingrained maladaptive behaviors, and all areas of work-related limitations were rated as "no useful ability to function" (Tr. 489-490). In her everyday functioning, Nurse O'Reilly opined that Plaintiff has extreme difficulties in maintaining social functioning, but only mild, if any, impairment in activities of daily living and maintaining concentration, persistence, and pace (Tr. 491). No episodes of decompensation were reported (Tr. 491).

An Obesity Medical Source Statement was completed by Dr. Steineck dated January 27, 2010 (Tr. 614-618). Dr. Steineck reported that he had treated Plaintiff for ten months, and saw her approximately every two months. She weighed 324 pounds and was 5'6". Dr. Steineck reported chronic pain, on a daily basis despite pain medication (Tr. 614). Dr. Steineck opined that Plaintiff can walk only two or three city blocks without rest or severe pain; that she can sit thirty minutes at a time, but needs to shift positions at will between sitting, standing, and walking (Tr. 614). Further, he opined that Plaintiff will need unscheduled breaks due to her condition, but could not state how often breaks were needed. Dr. Steineck opined while Plaintiff is capable of only low stress work, her impairments produced good and bad days (Tr. 617). Finally, Dr. Steineck opined that Plaintiff will

likely be off task 20% of the day.

## IV.     SUMMARY OF TESTIMONY

Plaintiff alleged disability due to diabetes, muscle pain, rheumatoid arthritis, the need for a knee replacement, bipolar disorder, and anxiety (Tr. 179). Plaintiff graduated from high school and obtained a college degree in culinary arts and studied business management for either one or two years (Tr. 155, 184, 303). She worked as a prep cook from the early 1990's through 2006, and worked as an employee hairdresser between 2004 and March 2006 (Tr. 150). Plaintiff also worked as a self-employed hairdresser for more than one and one-half years after she originally claimed to be unable to do any work, and through October 30, 2008, her amended disability onset date (Tr. 22, 114). Plaintiff explained that she did micro-braiding of hair in her home for about forty to sixty-eight hours per week, but stopped because she did not want to be around people (Tr. 22).

At her February 2010 hearing, Plaintiff maintained that she could not return to her former work, and could not cook meals, because of problems with her hands (Tr. 42). In September 2008, she was noted to have mild carpal tunnel syndrome, and prescribed bilateral wrist splints, to be worn at night (Tr. 558). In mid-November 2008, Plaintiff had carpal tunnel surgery on the right wrist, and she did well, without any complications (Tr. 562).

Plaintiff also denied being able to shop, due to the fear of crowds (Tr. 42). In May 2008, Plaintiff stated that she always had social anxiety, but she admitted that her anxiety symptoms had improved with consistent use of the anti-anxiety medications BuSpar and Vistaril (Tr. 436). Plaintiff has described herself as having been married once or twice, as having no children from her marriages, and as having an eighteen year-old son (Tr. 119-20, 128, 326, 510). Plaintiff testified that she lives with a male friend, Desmond, who reminds her to take her medications and does all of the

8

housekeeping (Tr. 39, 42). She receives partial disability payments from the Ohio Department of Human Services (Tr. 31).

Plaintiff has a history of substance abuse and has made inconsistent statements about her substance abuse. In February 2010, Plaintiff testified that alcohol was "never my thing," and that she had not even sipped alcohol or used drugs in about six to ten years because of possible interaction with her medications and the risk of cardiac arrest (Tr. 37). Plaintiff maintained that she had not used marijuana in the past two years and nine months, and that she had not used cocaine during the past thirteen to sixteen years (Tr. 38). In December 2008, Plaintiff admitted that she had been convicted of stealing $600 while working as a cashier, but denied incarceration, and served a term of probation between April 2006 and April 2008 (Tr. 36, 337, 378, 509).

The ALJ proposed a hypothetical of a person with the same age, education, and past work as the Plaintiff, who is occasionally able to lift twenty pounds and frequently lift ten pounds, is able to stand and walk six hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday. She has unlimited push-and-pull. She is able to understand, remember, and carry out simple instructions in a world-related setting, is able to occasionally interact with co-workers and supervisors under routine supervision, could frequently climb ramps or stairs, can never climb ladders, ropes, or scaffolds, can frequently balance, stoop, and kneel. She can occasionally crouch or crawl, and should avoid contact exposure to extreme heat and avoid any concentrated exposure to hazards, such as machinery and heights. The ALJ asked whether this individual would be able to perform the Plaintiff's past relevant work as those occupations are generally performed in the national economy (Tr. 51-52).

The vocational expert stated that Plaintiff's past work as a cook was skilled medium exertion, as performed in the national economy, and that her work as a hairdresser was skilled light exertion as

9

performed in the national economy.

The vocational expert further concluded that Plaintiff could not perform her past work, but she could perform unskilled work, such as cleaner, housekeeper (DOT 323.687-014), which is light work (Tr. 52). There are approximately 2,400 positions in northeast Ohio, approximately 8,000 in Ohio, and approximately 250,000 in the national economy (Tr. 52).

## V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. 404.1520(c) and 416.920(C)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward

with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity.  *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.  *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VII.   ANALYSIS

Issues presented for review are as follows:

11

>    A.   Whether substantial evidence supports the ALJ's finding that Plaintiff was capable of performing other work?
>
>    B.   Whether the ALJ failed to articulate the weight she assigned to the treating source opinion and whether the ALJ rejected the opinion in accordance with the treating physician rule?

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work (Tr. 75). She found her limited to no more than occasionally lifting twenty pounds and frequently lifting ten pounds; standing and walking for six hours in an eight-hour workday; and sitting for six hours in an eight-hour workday (Tr. 75). She concluded that Plaintiff was limited to frequently climbing ramps and stairs and was restricted from climbing ladders, ropes, and scaffolds (Tr. 75). She further found that Plaintiff could balance, stoop, and kneel no more than frequently, and she can crouch and crawl no more than occasionally (Tr. 75). She limited Plaintiff from concentrated exposure to extreme heat and any concentrated exposure to hazards, and frequently fingering (Tr. 75). She determined that Plaintiff was limited to understanding, remembering, and carrying out complex and simple instructions in a work setting, and only occasionally interacting with co-workers and supervisors, under routine supervision (Tr. 75).

The ALJ concluded that Plaintiff had a severe combination of impairments, including osteoarthritis, depression, anxiety, and obesity (Tr. 72). He found that Plaintiff's history of substance abuse was not a severe impairment (Tr. 72). As Plaintiff acknowledges, Dr. David Dietz, Ph.D., a state agency psychologist, completed a "Psychiatric Review Technique" after evaluating the record evidence under the Commissioner's Listings 12.04 and 12.06, and found that Plaintiff had mild only limitations in social functioning, and maintaining concentration and pace, but no limitation in daily living and no episodes of decompensation (Tr. 356-66). In addition, Nurse O'Reilly checked a box, noting that

Plaintiff had an extreme limitation in social functioning, but she also responded affirmatively to the question, "is your patient a malingerer," and "no" when asked whether Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations" described by Plaintiff (Tr. 438, 492). Although Nurse O'Reilly is not a treating source, her opinion was entitled to consideration by the Commissioner.

The ALJ found Plaintiff more physically limited than the state agency physician and credited the opinion of the state agency psychologist over the opinion of Nurse O'Reilly, who found that Plaintiff had none or mild limitations in three of the B (functional) criteria, but posited an extreme limitation in social functioning (Tr. 491). The ALJ reasonably discounted the nurse's opinion, which affirmatively found that Plaintiff was malingering, and that her subjective complaints were not consistent with her examination findings (Tr. 77, 492).

Plaintiff's legal contention is that this case must be remanded because the ALJ did not articulate the weight afforded to Dr. Steineck's January 2010 opinion, and rejected the opinion without a good reason (Pl. Br. 8). Although a treating physician's opinion is generally entitled to additional, and sometimes even controlling weight, due to the nature of the treatment relationship, such opinions may be discounted if good reasons are provided. 20 C.F.R. Sections 404.1527(d)(2) and 416.927(d)(2). *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ did explicitly provide reasons why she did not accept the limitations posited by Dr. Steineck, which counsel presented to the vocational expert during cross-examination. In the decision, the ALJ stated that counsel had asked the vocational expert whether his finding that jobs were available would change if the worker (1) could only sit for thirty minutes at a time and then had to get up and move around; (2) stand for twenty minutes at a time; (3) had to shift position at will with standing, sitting, and walking; (4) had to walk every sixty minutes for about five minutes; (5) had to take unscheduled breaks (that were not defined in terms of frequency and length; (6) if the claimant was limited in grasping to 10%, fine manipulation

13

to 20%, reaching in front 10% and reaching overhead 20%; and (7) was off-task 20% of the time (Tr. 79). The vocational expert responded that there would be no jobs available (Tr. 79-80).

The ALJ effectively articulated why she did not accept the limitations denoted by Dr. Steineck's January 2010 opinion, which were precisely the same as the limitations posited in the cross-examination question. The ALJ stated that "counsel's proposed residual functional capacity" was not "a representation of the most the claimant can do" (as required by SSR 96-8p). (Tr. 79). The ALJ further found that there was "minimal, if any, evidence regarding difficulty using the hands, and some examinations have even shown good grasping" (Tr. 79). The ALJ found "insufficient objective medical evidence regarding the back in terms of MRI findings and functional limitations" to warrant counsel's limitations (Tr. 79). She found "minimal, if any, evidence regarding a limitation on reaching." Ultimately, the ALJ concluded that "the objective medical evidence along with consideration of the claimant's credibility" did not warrant a finding that Plaintiff "would have to be off-task to such an extent that she could not sustain full time work" (Tr. 79). In discussing the January 2010 medical evidence, the ALJ noted that her examination showed no abnormalities, and that she was able to move her extremities without difficulty (Tr. 73).

Dr. Herbert Russell, the treating physician, thought that Plaintiff was malingering on January 21, 2010, and confronted her, because she had sought narcotic pain medication following a minimally-invasive surgical procedure (Tr. 605). Plaintiff was thought to be malingering only six days before Dr. Steineck completed paperwork in support of her disability claim (Tr. 592, 615).

Dr. Steineck's checkmark opinion was patently deficient, given the lack of medical support for it, and the multiple qualifications by Dr. Steineck that he was unsure about Plaintiff's work capacity (Tr. 614). As stated above, Dr. Russell and Nurse O'Reilly provided opinion evidence that Plaintiff was malingering (Tr. 482, 605), which undermines the reliability of Dr. Steineck's checkmark opinion.

14

**VIII.   CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform other jobs despite certain limitations, and, therefore, was not disabled. Hence, she is not entitled to DIB and SSI.

Dated: May 23, 2012                                     */s/George J. Limbert*
                                                                          GEORGE J. LIMBERT
                                                                          UNITED STATES MAGISTRATE JUDGE